IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOSEPH S. WEISMAN, M.D, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:22-cv-00595 |
| | ) | |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| THE GUARDIAN LIFE INSURANCE | ) | United States District Judge |
| COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

In this action brought pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, plaintiff Dr. Joseph S. Weisman contends that The Guardian Life Insurance Company of America (Guardian) wrongfully denied his claim for long-term disability (LTD) benefits under a group disability policy. The case is before the court on the parties' cross-motions for summary judgment, which are fully briefed and ripe for disposition. For the reasons discussed herein, the court will grant Weisman's motion, deny Guardian's motion, and reverse Guardian's denial decision.

I. BACKGROUND

Dr. Weisman is a neuro-ophthalmologist and ophthalmic surgeon. He owned and operated Blue Ridge Eye Center for decades, serving as the practice's sole physician. He closed Blue Ridge Eye Center on December 31, 2021,[1] and he resigned on the same date, alleging that he was disabled by that date. Specifically, he contends that a progressive neurological condition had led to uncontrollable tremors such that he believed he could not safely perform even minimally invasive ophthalmic surgeries as of that date.

---

[1] The briefing sometimes uses other dates, such as December 28, 2021, but at the hearing the parties agreed that the practice closed on December 31.

In 2001, Blue Ridge Eye Center purchased a group insurance policy that qualified as an employee welfare benefit plan governed by ERISA (the Plan), and it maintained the Plan until the closure of the practice.  Under the Plan, Guardian acted as plan administrator and claims fiduciary.  The Plan provided for both short-term disability benefits (STD) and long-term disability benefits (LTD).  Many of the Plan terms and conditions for eligibility are the same for both types of benefits, although STD benefits are payable for no more than 26 weeks.  LTD benefits are higher amounts than STD benefits and continue for longer.  Relevant provisions of the Plan are discussed in context herein.

**A.  Dr. Weisman's Medical Condition**

The first mention in any of Dr. Weisman's medical records related to a tremor is in a March 15, 2021 treatment note with his internist, Dr. Mitchell.  Under "History of Present Illness," Dr. Mitchell's note states "tremor through the week; coffee only on the weekend; he can overcome the tremor, with thinking about it, deep breaths, etc."  (Administrative Record (AR) 693, Dkt. Nos. 10-1 & 10-2.)[2]  Dr. Mitchell's records apparently do not contain any other references in 2021 to Dr. Weisman's tremors.

When Dr. Weisman submitted his claim to Guardian, he explained that, as a physician, he had self-diagnosed and self-treated his tremor since it first appeared in 2015.  He prescribed himself beta blockers, and those were successful in managing his symptoms through 2019.  At that point, though, he began to experience significant negative side effects from the medicine, and determined that it was no longer feasible or appropriate to take it.  He stopped performing cataract surgery at that time.  Later, as of the date he claims he was fully disabled (December 31, 2021), he stopped performing all surgeries and stopped working altogether.

---

[2]  There are multiple copies of some of the same documents within the AR, and the parties sometimes cite to different ones.  Generally, the court cites herein to the first instance a particular document appears.  Citations to page numbers refer to the numbers in "WEIS####" in the bottom right of each page.

When he applied for LTD benefits, Dr. Weisman provided a report from Dr. Jill Cramer. Dr. Cramer, a neurologist, first evaluated Dr. Weisman on March 10, 2022.  She stated in her office note that Dr. Weisman suffered from a progressive "essential tremor," describing his condition as: "Mild end-motion tremor and tremor with sustension B UE, tremors worsen with fine movements [and] tremulous archimedes' spiral."  (AR 415.)  She further assessed:

> Tremor that worsens with fine motor movements.  Unfortunately does not tolerate the most likely to be tolerated treatment, beta blockade.  Alternative medications are likely to worsen condition [sic], fatigue.  For his occupation as an opthalmologist [sic] who performs fine surgical procedures as a regular part of his occupation, he is not able to continue these procedures safely.  I do not feel that he should be performing cataract surgeries or other fine movements required to work with people's eyes.

(*Id.*)  Dr. Cramer's notes also indicated that she filled out disability paperwork on Dr. Weisman's behalf and that she would follow up with him annually, or as needed in the meantime.  (*Id.*)  Her progress notes contained additional information about his history of tremors, his self-management and self-treatment of his tremor with beta blockers, the "intolerable side effects" that developed in late 2019, and the worsening of his tremor over time.  (AR 418.)

Dr. Cramer also provided to Guardian a written statement dated April 22, 2022, and a report dated May 25, 2022.  (AR 604–06.)  In the signed statement, she reiterates her diagnosis. She also specifically states that she approves of Dr. Weisman's chosen treatment plan and would not have done anything different, had she been his neurologist:

> I endorse without qualification his diagnosis and treatment plan since 2015.  The treatment, outcomes, and prognosis would have been unchanged had I earlier been directly involved in his case. Additional care and treatment beyond his own management would have been of no benefit and would not have allowed him to continue performing cataract surgery beyond December 2019 or continue performing other surgical procedures beyond December 2021.  The medical care, including medication regimen, Dr. Weisman received prior to my involvement in March 2022 is precisely the treatment regimen I would have prescribed for him as a neurologist.

3

(AR 604.)  Her later report confirmed her opinion that he was fully disabled and could never

return to full-time work performing surgeries.  (AR 605–06.)  These documents were all received

by Guardian on July 21, 2022, as part of Dr. Weisman's appeal of the denial of his LTD benefits.

(AR 609.)

**B.  Dr. Weisman's Claim for Benefits**

Dr. Weisman submitted a letter from his attorney which he calls a "Notice of Claim" on

January 13, 2022.  (AR 410–11.)  On or about March 15, 2022, Guardian found Dr. Weisman

eligible for STD coverage, and it paid the maximum amount (26 weeks) of STD benefits to him.

(AR 127–29.)

As to Dr. Weisman's claim for LTD benefits, it was initially denied on April 28, 2022,

about six weeks after Guardian had approved Dr. Weisman for STD benefits.  (AR 725–28.)

That decision was based on the lack of "objective medical documentation to support any

restrictions and/or limitations as of [his] last day of work on December 31, 2021."  (AR 726.)

The decision also noted that Dr. Weisman "did not seek treatment for [his] tremor until March

10, 2022, and that he was no longer insured by the Plan when he began treatment.  (*Id.*)  He

appealed that denial, but the denial was upheld upon appeal.  (AR 117–123.)

On appeal, Guardian's "nurse case manager" reviewed the evidence, including Dr.

Cramer's submissions.  As it did in its initial decision, Guardian again noted a lack of "objective

clinical evidence" and a "lack of evidence to support" that Dr. Weisman was fully disabled as of

December 31, 2021, when he stopped working and when coverage under the Plan ended.  (AR

123.)

As summarized by Guardian, the reasons for the denial included:

> (1) the failure to provide any medical evidence that Dr. Weisman
> was under the regular care of a doctor for the alleged disability while
> he was an active, full-time employee, (2) the "lack of treatment
> intensity and frequency as Dr. Weisman was first seen by a

Neurologist on March 10, 2022 and there was no follow up noted until one year," (3) the "treatment plan did not include medication and there were no referrals made," (4) the lack of any medical evidence that Dr. Weisman was diagnosed with any disability while he was an eligible employee, (5) the lack of any medical evidence that Dr. Weisman had been diagnosed by a doctor with a condition that precluded him from performing the major duties of his employment while he was an eligible employee, (6) the only reference to tremors in his primary care physician records was a March 2021 note that indicated that Dr. Weisman could control the tremors by thinking about them and did not include any diagnosis, treatment plan, or follow-up care and, (7) Dr. Weisman retired and closed his practice prior to filing the claim, at which time he was no longer actively at work and was thus ineligible for benefits.

(Guardian's Combined Mem. 7–8, Dkt. No. 17 (citing Compl. ¶ 27 and the "Uphold Letter," at AR 117–123 (cited by Guardian as AR 575–581, *see supra* note 2)).)[3]

The appeals case manager also offered an explanation for why the LTD determination was different than the STD determination, suggesting that the LTD investigation by Guardian was "more thorough," in conjunction with the statement that "STD benefits are for a shorter period of time and the decision may have been based primarily on a diagnosis and job duties." (AR 123.) Dr. Weisman seizes on these statements as evidence that Guardian was biased toward denying LTD benefits because they cost Guardian more than STD benefits, *i.e.*, they are higher than STD payments and they last longer. (Pl.'s Corrected Mem. Support Mot. Summ. J. (Pl.'s Mem.) 7, 11–16, Dkt. No. 15.)

## II.  DISCUSSION

### A.  Standard of Review

Dr. Weisman seeks judicial review of the denial of his claim for LTD benefits pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). This provision authorizes a plan participant to bring a "civil action . . . to recover benefits due to him under the terms of his plan,

---

[3]  Guardian filed a combined memorandum in support of both its opposition to the plaintiff's motion for summary judgment and in support of its own motion for summary judgment.  (Dkt. No. 17.)

to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). He has moved for either summary judgment or, in the alternative, for a remand of the matter to Guardian for reconsideration and a more reasoned explanation for its final decision denying him benefits. (Pl.'s Mot. Summ. J. or Remand 1–2, Dkt. No. 13.) Guardian opposes Dr. Weisman's motion and seeks summary judgment in its favor.

At the outset, the parties disagree over the appropriate standard of review, although both parties contend that they are entitled to summary judgment regardless of which standard is applied. The standard of judicial review under § 1132(a)(1)(B) "turns on whether the benefit plan at issue vests the administrator with discretionary authority." *Helton v. AT & T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If the benefit plan "vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the plan administrator's decision for abuse of discretion." *Id.* (internal quotation marks and citation omitted). "If a plan does not give the administrator discretionary authority, a district court reviews the coverage determination de novo." *Id.* (citations omitted).

In this case, the parties agree that the Plan vests Guardian with discretionary authority, which normally would require this court to review for abuse of discretion. *See id.* But Dr. Weisman contends that this court should nonetheless review Guardian's decision de novo. For support, he first points out that Guardian's final decision denying his appeal was several days

late under the ERISA regulations.[4]  Dr. Weisman then relies upon 2018 amendments to the

relevant regulation, 29 C.F.R. § 2560.503-1(l), which requires "strict" rather than "substantial"

compliance with ERISA adjudication deadlines.

Specifically, that regulation provides:

(l) Failure to establish and follow reasonable claims procedures.

(1) In general. . . .

(2) Plans providing disability benefits.

(i)      In the case of a claim for disability benefits, if the plan fails to
strictly adhere to all the requirements of this section with respect to
a claim, the claimant is deemed to have exhausted the administrative
remedies available under the plan, except as provided in paragraph
(l)(2)(ii) of this section. Accordingly, the claimant is entitled to
pursue any available remedies under section 502(a) of the Act on the
basis that the plan has failed to provide a reasonable claims
procedure that would yield a decision on the merits of the claim. If
a claimant chooses to pursue remedies under section 502(a) of the
Act under such circumstances, the claim or appeal is deemed denied
on review without the exercise of discretion by an appropriate
fiduciary.

29 C.F.R. § 2561.503-1(l)(2).  In subsection (ii) there is an exception for de minimis violations

that do not cause prejudice or harm to the claimant, but only if the administrator satisfies certain

requirements.  Guardian does not contend that it can satisfy any of these requirements.  Thus,

this case is governed by subsection (i).

Pursuant to the plain language of that subsection, and by its own admission, Guardian

failed to "strictly adhere to all the requirements" of 29 C.F.R. § 2560.503-1(l)(2)(i).  This failure

allows the claimant to "pursue any available remedies under Section 502(a)" and "the claim . . .

---

[4]  Guardian concedes that its appeal decision was several days late.  It was required to be issued within 45
days.  29 C.F.R. § 2560-503(i)(3)(i).  Specifically, it was issued on September 8, 2022, 49 days after it received Dr.
Weisman's Notice of Appeal.  On September 12, not yet having received a copy, Dr. Weisman's counsel advised
Guardian that more than 45 days had elapsed.  He warned that he would deem the appeal denied and file suit if he
did not receive the decision by September 21.  On September 26, Guardian advised Dr. Weisman's counsel via
email that the letter had been sent to Dr. Weisman on September 8 and faxed a copy to counsel on that date.  This
lawsuit was filed on October 19, 2022.

is deemed denied on review without the exercise of discretion by an appropriate fiduciary." *Id.* Because the administrator is deemed not to have exercised discretion, review would be de novo. *See Fessenden v. Reliance Std. Life Ins. Co.*, 927 F.3d 998, 1004 (7th Cir. 2019) (holding that a tardy decision from a plan administrator is reviewed de novo); *Brewer v. UNUM Group*, 622 F. Supp. 3d 1113, 1128–32 (N.D. Ala. 2022) (same).

The parties briefed this issue at length, and the court has carefully considered their arguments. Neither party has cited to a Fourth Circuit case that directly addresses this issue, but Dr. Weisman urges the court to "follow the strict compliance approach embraced by the Seventh Circuit in *Fessenden*, 927 F.3d at 998[,] and the [Department of Labor] in 29 C.F.R. § 2560.503-1(l)(2)(i)." (Pl.'s Mem. 9.) He also points to other cases that have concluded that a failure to meet ERISA deadlines means that the plan administrator forfeits discretionary review. *E.g.*, *Rupprecht v. Reliance Std. Life Ins. Co.*, 623 F. Supp. 3d 683, 692 (E.D. Va. 2022); *Krysztofiak v. Boston Mut. Life Ins. Co.*, No. DKC 19-0879, 2021 WL 5304011, at *3 & n.4 (D. Md. 2021).

Guardian counters—and the court recognizes—that this case is different than many of the cited cases from a factual standpoint. In particular, here a decision was issued (albeit late) and his counsel was aware of it before Dr. Weisman filed suit.[5] (*See* Combined Mem. 13–14). That stands in contrast to the facts in many of these cases—including *Fessenden* and *Brewer*—in which a decision was not issued before suit was filed. Guardian posits that de novo review would apply only where there was no decision before suit was filed. *See also Rupprecht*, 623 F. Supp. 3d at 692 ("Circuit Courts of Appeal that have considered this issue have generally concluded in various fashions that de novo review applies if an appeal decision never issued as opposed to one issued belatedly.")

---

[5] Guardian also relies on cases that applied a "substantial compliance" rule before the 2018 Amendment, (Combined Mem. at 13–14), which the court does not find convincing in light of the amendment.

While the parties present an interesting legal issue, the court need not resolve it in this case.  Even applying the abuse-of-discretion standard, which is less favorable to Dr. Weisman, the court would rule in his favor.  Accordingly, the court addresses the case as if it is reviewing it for an abuse of discretion, assuming but not deciding that is the proper standard of review.

In this context, reviewing for an abuse of discretion has a "particularized conception," "equat[ing] to reasonableness."  *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008).  In reviewing for an abuse of discretion, the court "will not disturb a plan administrator's decision if the decision is reasonable, even if [the court] would have come to a contrary conclusion independently."  *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629 (4th Cir. 2010).  Put differently, the court may not substitute its own judgment for that of the plan administrator.  *Id.*  "To be held reasonable, an administrator's decision must result from a deliberate, principled reasoning process and be supported by substantial evidence."  *Id.* (internal quotation marks and citation omitted); *Evans*, 514 F.3d at 322.

Substantial evidence is that "which a reasoning mind would accept as sufficient to support a particular conclusion."  *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011).  It consists of "more than a scintilla but less than a preponderance."  *Newport News Shipbuilding & Dry Dock Co. v. Cherry*, 326 F.3d 449, 452 (4th Cir. 2003) (internal quotation marks omitted).

To be upheld as a valid exercise of its discretion, the administrator's decision also must "reflect careful attention to 'the language of the plan,' as well as the requirements of ERISA itself."  *Evans*, 514 F.3d at 322 (quoting *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000)).  Summarizing the  requirements, the Fourth Circuit has explained that an ERISA administrator's decision survives abuse-of-discretion review if it: (1) adheres both to the text of ERISA and the plan; (2) rests on good evidence and sound

reasoning; and (3) results from a fair and searching process.  *Id.* at 322–23.

The Fourth Circuit has identified a number of nonexclusive factors that a court may consider in reviewing a plan administrator's decision for reasonableness.  *See Booth*, 201 F.3d at 342–43.  The factors include: (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.  *Id.*  Not all of the *Booth* factors are relevant in every case, and an express discussion of each factor is unnecessary.  *Helton*, 709 F.3d at 357.

## B.  Guardian Abused Its Discretion When It Denied Dr. Weisman LTD Benefits.

Of those that the court believes are relevant, the *Booth* factors weigh in Dr. Weisman's favor, some more strongly than others.  First of all, there is a clear structural conflict of interest because Guardian "serves in the dual role of evaluating claims for benefits and of paying benefits."  *Williams*, 609 F.3d at 632.  Thus, the eighth factor (the fiduciary's motives and any conflict of interest it may have) weighs strongly in favor of Dr. Weisman.

As to the third factor (the adequacy of the materials considered to make the decision and the degree to which they support it), the court observes that Guardian took a minimalist approach in terms of its process in denying Dr. Weisman benefits.  Unlike many other cases where a physician might be consulted, Guardian never sought to affirm or determine whether Dr. Cramer's assessment of Dr. Weisman's symptoms and complaints were accurate.  Instead, its reasons for the denial ultimately relied only on a "nurse manager's" review of the file and

information.  No independent medical evidence or assessment was ever done or requested by Guardian.  This failure is discussed in more detail below, in addressing whether there was sufficient evidence to support a finding of disability.  *See infra* Section II-B-4.

Additionally, the late issuance of the appeal—regardless of whether it alters the standard of review—means that the decision was not consistent with the procedural requirement of ERISA, a fact relevant to the sixth *Booth* factor (whether the decision was consistent with the procedural and substantive requirements of ERISA).  This factor, too, weighs in Dr. Weisman's favor.

With regard to the first *Booth* factor (the language of the plan), the parties disagree about a number of provisions and their meaning.[6]  For its part and in its briefing, Guardian emphasizes four reasons why its decision to deny benefits was appropriate and proper under the language of the Plan.  Specifically, it argues that: (1) Dr. Weisman was not an eligible employee when he applied for LTD benefits; (2) Dr. Weisman was not under the regular care of a doctor, as that term is defined in the Plan; (3) Dr. Weisman failed to show that he was "disabled" while an eligible employee; and (4) Guardian's decision to grant STD benefits did not affect its ability to deny LTD benefits.  (*See generally* Def.'s Combined Mem. 14–25.)  The court addresses each argument and Dr. Weisman's response thereto in turn.

### 1. Dr. Weisman Was Eligible to Apply for Benefits, Despite the Termination of his Employment and the Plan.

Guardian argues that an individual must be an active, full-time employee as of the date

---

[6] Dr. Weisman contends—and points out that Guardian does not dispute—that ambiguities in the plan must be construed against Guardian and instead "construed in accordance with the reasonable expectations of the insured."  *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 165 (4th Cir. 2013) (quoting *Gallagher v. Reliance Std. Life Ins. Co.*, 305 F.3d 264, 269)).  (*See also* Pl.'s Mem. 21, Dkt. No. 15 (arguing same); Pl.'s Reply 9 n.1, Dkt. No. 20 (noting that Guardian did not challenge that proposition in its opening memorandum).)  But the *Cosey* Court made that statement in the context of determining whether an abuse-of-discretion standard applied.  735 F.3d at 165.  Once it is determined that deference is owed to the plan administrator, its interpretation and application of the Plan must be upheld, after consideration of the *Booth* factors, if it is reasonable.

that the employee *applies for benefits*.  Guardian contends that Dr. Weisman retired and closed his medical practice in December 2021 and thus was no longer an employee under the Plan on February 1, 2022, when he applied for LTD benefits.  It cites to three cases for support.  (*See* Combined Mem. 14–17.)

Dr. Weisman responds that the Plan requires only that the employee become disabled while the Plan is in effect, not that an employee apply for benefits prior to the Plan's expiration. Although he cites to no legal authority of his own, Dr. Weisman emphasizes in his reply that the three cases cited by Guardian are easily distinguishable.  (Pl.'s Reply Mem. 38, Dkt. No. 20.)

The starting point for the court's analysis is the language of the Plan.  Two provisions are relevant to this issue.  First, a section titled "If This Plan Ends" states:

> This insurance ends when the group plan ends.  It also ends when this insurance is dropped from the group plan for all insureds, or for your class.  If you are *disabled* when this insurance ends, we will treat you as if your insurance did not end.  But, your benefit will be based on all of the terms of this plan.

(AR 32.)[7]

Second, the Plan provides, in relevant part . . . :

> **How Payments Start:**  To start getting payments from this *plan*, a covered person must meet all of the conditions listed below:
>
> (a) You must (i) become *disabled* while insured by this *plan;* and (ii) remain *disabled* and insured for the *plan's elimination* period.
>
> (b) You must be: (i) under a *doctor's regular care* for the cause of his or her disability, starting from the date you were first disabled; and (ii) receiving medical care appropriate to the cause of your *disability* and any other *sickness* or *injury* which exists during his or her *disability.*

(AR 28–29.)  There is also a subsection (c), but it is not at issue here.

---

[7]  Where this opinion quotes from the Plan, the court includes all italics that are in the original.  Each italicized word has a specific definition in the Plan.

Based on the plain language of the section discussing when the plan ends, an applicant who is "*disabled* when this insurance ends" will be treated "as if [the applicant's] insurance did not end." (AR 32.)  That section does not state that an applicant had to have been *determined* by Guardian to be disabled when the plan ends, only that he or she be disabled.  Nor does it say that proof of disability must be provided before the Plan ends.  Further, the definition of disability or disabled simply means that a person has "physical, mental or emotional limits caused by a current *sickness* or *injury*.  And, due to these limits, you are not able to perform, on a full-time basis, the major duties of your *own occupation*." (AR 41.)

Likewise, the conditions set forth in subsection (a) above do not state that a covered person must have been "determined to be disabled" or "receiving benefits" while insured, only that he must "become disabled when the insurance ends." (AR 32.)  Thus, if Dr. Weisman became disabled before the Plan ended, that is sufficient to satisfy that subsection.  There is no requirement that he had applied for, or be receiving, benefits before the Plan ends.

Indeed, as noted by Dr. Weisman, Guardian's reading would lead to the "absurd, inequitable" result that a participant severely injured in an accident the day before the Plan ended, but hospitalized for weeks thereafter and applying for benefits after the Plan had ended, would be automatically disqualified from obtaining benefits.  (Pl.'s Reply 5.)

The court also has considered the cases cited by Guardian, but finds them factually distinguishable for a number of reasons.  The court touches on some of them briefly.  *Jones v. Unum Provident Corp.*, 596 F.3d 433 (8th Cir. 2010), involved an employee who quit at a time when both her treating physician and the administrator agreed she was not disabled.  *Id.* at 435–36.  Similarly, in *Sanford v. Life Ins. Co. of N. Am.*, 1 F. Supp. 3d 829 (M.D. Tenn. 2014), the plaintiff alleged his disability commenced *after* his resignation, although he was still being paid his regular salary at the time, because he had weeks of accrued paid time off.  *Id.* at 831.  The

plan there provided that coverage would end on the earliest of a number of different dates, including "the date the Employee is no longer in Active Service." *Id.* On those facts, and reviewing under an arbitrary and capricious standard, the court upheld the administrator's decision that the plaintiff was not eligible for benefits. *Id.* at 834, 837–38.

In contrast to the facts in either of those cases, Dr. Weisman alleges that he was disabled at the time he resigned and while the Plan was still in effect. This allegation is supported by his own medical opinion and Dr. Cramer's uncontested medical opinion.

*Perry v. New England Business Serv. Inc.*, 347 F.3d 343 (1st Cir. 2003), also is distinguishable. There, the First Circuit affirmed the administrator's denial of benefits to a woman who was on a six-year leave of absence because of a work-related injury. The disability plan specifically excluded coverage for occupational injuries, like hers. The court explained that "her disability leave was the result of an occupational injury and thus had the effect of terminating her insurance and rendering her ineligible for continuation of coverage." *Id.* at 345. That case did not deal with a plan ending, and, as Dr. Weisman notes, his tremors are not the result of a workplace injury and Guardian has never put that forth as a reason for denial.

For these reasons, the court finds it irrelevant under the Plan's language that Dr. Weisman did not apply for benefits until after the Plan ended and was no longer in effect. So long as he can establish that he was in fact disabled as of December 31, 2021, or before, when coverage was still in effect, he is potentially eligible for benefits. Thus, this ground for denying benefits is not reasonable or reasoned, nor is it consistent with a reasonable interpretation of the Plan's terms.

2. **Dr. Weisman satisfied the "regular care" provision of the Plan, because he was exempt pursuant to the second sentence of the definition of that term, and he was receiving "medical care appropriate to the cause of his . . . disability."**

Guardian also contends that Dr. Weisman cannot satisfy the second requirement to be

eligible for benefits.  As cited above, and to be eligible for benefits, Dr. Weisman must be:

> (b) (i) under a *doctor's regular care* for the cause of your *disability*, starting from the date you were first *disabled*; and (ii) receiving medical care appropriate to the cause of your *disability* and any other *sickness* or *injury* which exists during your *disability*.

(AR 29.)  The term "doctor" is further defined to exclude the applicant for benefits.  (AR 41.)

Thus, Dr. Weisman's self-treatment cannot constitute care by a doctor.

The court concludes that Dr. Weisman can satisfy both subsection (i) and subsection (ii).

As to the first, he must be (i) under a doctor's regular care for the cause of his or her disability, starting from the date he was first disabled.  The Plan defines "regular care" as follows:

> You are being treated by, or in consultation with, a *doctor* at a frequency that is consistent with your condition.  The requirement for *regular care* does not apply if you have reached your maximum point of recovery yet are still *disabled* under the terms of this *plan*.

(AR 43.)  Based on the record, it appears that he was first disabled as of December 31, 2021, when both he and Dr. Cramer state that he could not perform the main functions of his job.

Thus, as of that date, he was disabled per the Plan's definition.

Dr. Weisman insists that he satisfies both sentences of the "regular care" definition, while Guardian submits that he satisfies neither.  The court need not address the first sentence, because it concludes that Dr. Weisman satisfies the second, which effectively exempts him from any requirement of regular care.

Dr. Weisman points out that both he and Dr. Cramer have offered their opinions, which are not disputed by any other physician, that he had reached his maximum point of recovery by December 2021 and that he continued—and would continue—to deteriorate.  Given the progressive nature of his disease, and his and Dr. Cramer's shared opinion that there was nothing else that could be done for it after the beta blockers could not be tolerated, any requirement for "regular care" was excused under the second sentence of definition.  (Pl.'s Mem. 22 ("Dr.

Cramer's uncontradicted statement of April 22, 2022, establishes that by December 2021 Dr. Weisman could not improve through *any* treatment modality. . . . The tremors can only worsen, not improve, with or without beta blockers, which have negative side effects, Dr. Cramer emphasized in her reports to Guardian.").)

Guardian counters that Dr. Weisman is putting the "cart before the horse." (Guardian Reply 3, Dkt. No. 25.) It insists that "[o]ne must first establish care with a doctor, who can then determine: 1) whether the patient is disabled, and 2) whether the patient has reached the maximum point of recovery. (*Id.*) Certainly, a disability plan could be written with that language and with that requirement. But the Plan here does not say that.[8]

For the above reasons, Dr. Weisman satisfies subsection (b)(i), the regular care provision, because he was excused from that requirement under the second sentence of the definition.

To satisfy subsection (b)(ii), Dr. Weisman also must show that he was "receiving medical care appropriate to the cause of his . . . *disability* and any other *sickness* or *injury* which exists during his . . . *disability.*" Again, Dr. Cramer's opinion testimony is dispositive on this issue. She has plainly stated that he had followed the appropriate course of treatment for his disability. Guardian has not offered any medical opinion or any evidence that Dr. Weisman was not receiving appropriate care for his disability or for any other sickness or injury, and the record does not reflect any.

For the foregoing reasons, Dr. Weisman qualifies as disabled under the provision, and

---

[8] At the hearing, Guardian lodged yet another objection to the application of this second sentence, one counsel admitted was nowhere in the written briefing. Specifically, it contended that Dr. Weisman actually was disabled years before December 31, 2021, in that he was no longer able to perform cataract surgeries and thus was not able to perform his own occupation full-time. For support, it points to Dr. Weisman's own statement that he stopped performing those surgeries in 2019 and to his tax records showing a decrease in income before 2021. There is no medical evidence that he was disabled at that point, as Dr. Cramer opined he was disabled as of December 31, 2021. Furthermore, Dr. Weisman was able to work full-time and to perform some surgeries after 2019. Importantly, moreover, Guardian did not offer this rationale in its decisions denying the claim, and the court does not consider it further here.

Guardian's position to the contrary is unreasonable because it ignores the language of the Plan and does not faithfully apply it.  The court further notes that even if Guardian's interpretation of this Plan provision is reasonable, that does not mean its entire decision was.  Instead, the court takes into consideration all relevant *Booth* factors when determining reasonableness.

### 3.  There was sufficient evidence to show that Dr. Weisman was disabled by December 31, 2021.

In its final decision denying Dr. Weisman LTD, what appeared to be Guardian's primary reason for denying LTD benefits is discussed in its third point in its combined memorandum. Specifically, it contends that there was insufficient evidence to show Dr. Weisman was disabled on or before December 31, 2021.[9]  Guardian appears to believe that there was not adequate medical evidence of disability as of that date.  Notably, though, the only physicians who have offered their opinions on this topic are Dr. Weisman and Dr. Cramer, both of whom have opined that Dr. Weisman was unable to work in his occupation as of that date.  The Fourth Circuit has recognized that an insured's subjective assessment of symptoms is relevant and cannot be disregarded or ignored by the insurer.  *Donovan v. Eaton Corp., Long Term Disability Plan*, 462 F.3d 321, 327 (4th Cir. 2006).  And here, that insured is himself a physician with training and education that likely entitles his opinions to even more weight.

Further, the fact that Dr. Cramer evaluated him several months after the fact is not determinative given her actual opinions, which Guardian seems also to have ignored and given no credit.  In particular, as noted, Dr. Cramer states that she "endorse[s] without qualification his diagnosis and treatment plan since 2015" and that "[t]he treatment, outcomes, and prognosis would have been unchanged" had she been directly involved in his case.  (AR 604.)  While Dr. Cramer was not a treating physician before he became disabled, she did conduct an independent

---

[9]  This seems inconsistent with Guardian's separate contention that Dr. Weisman could not perform full-time work years prior to December 2021.  *See supra* note 8.

exam of Dr. Weisman, and she did offer a medical opinion in this case.  Notably, that medical opinion, shared by Dr. Weisman, is not controverted by any other medical evidence in the case.

The mere fact that Dr. Cramer was not treating Dr. Weisman at the time she offered her opinions does not mean that her opinion is entitled to no weight or can be dismissed out-of-hand. In the social security context, for example, courts often evaluate the opinions of both treating physicians, examining physicians (the category to which Dr. Cramer likely belonged) and non-examining sources, who review medical records without ever examining the patient.  20 C.F.R. § 404.1527 (describing different types of medical sources and the weight accorded to each).[10] And courts have held that an examining physician's opinion referring to an applicant's position on a prior date, before that physician's examination or treatment began, can be entitled to weight, despite it being "retroactive."  *E.g.*, *Dean v. Astrue*, Civil No. SKG-09-007, 2010 WL 2464969, at * 11 (D. Md. June 11, 2010).

Additionally, this is not a case where a physician is making a retroactive assessment a long time after the alleged onset of complete disability.  The undisputed evidence is that Dr. Weisman suffered from a progressive condition that worsened over time, and Dr. Cramer evaluated him about two months after he became fully disabled.  Thus, she has offered her medical opinion that he was fully disabled on December 31, 2021, and could not perform the duties of his occupation at that time.  This opinion was based on her expertise and Dr. Weisman's reports to her regarding his prior symptoms and treatment, and it is certainly some evidence that he was disabled as of the earlier date.  Guardian's decision to ignore Dr. Cramer's medical opinions entirely was arbitrary and not a principled application of the Plan.  *See Smith v.*

---

[10]  The court recognizes that social security regulations and principles are not applicable in the ERISA context.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832–33 (2003) (noting that there are "critical differences between the Social Security disability program and ERISA benefit plans such that rules from the former area should not be incorporated into the latter").  But this particular regulation provides useful information about the different types of treating relationships medical personnel may have with an individual and shows that weight can be given to the opinions of physicians evaluating an individual after they became disabled.

*Reliance Std. Life Ins. Co.*, 778 F. App'x 207, 211 (4th Cir. 2019) (observing that "administrators 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician" (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

The court also agrees with Dr. Weisman that the appellate decision stating that Dr. Weisman failed to present "objective clinical evidence" of his disability is contrary to the medical records and the terms of the Plan.  The Plan does not require "objective clinical evidence," only "proof."  (AR 91, 93.)  To deny Dr. Weisman's claim based on any lack of objective clinical evidence, then, was improper and shows that the decision was not consistent with the Plan.  *See Tekman v. Reliance Std. Ins. Co.*, 55 F. 4th 951, 968 (4th Cir. 2022) ("[A] plan administrator may not require objective proof of disability if the plan does not contain such a requirement."); *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 171 (4th Cir. 2013) (finding that the district court erred when it concluded that administrator could deny STD and LTD claims on the basis that her proof lacked "objective evidence" where neither plan required a claimant's submission of proof to contain an "objective component").

### 4. Guardian's decision to grant STD benefits did not require it to grant long-term benefits, but it undermines its rationale for the denial of LTD benefits.

Throughout his opening brief, Dr. Weisman focuses on what he deems inexplicable and unreasonable inconsistencies between the decision to grant Dr. Weisman STD benefits and the decision to deny him LTD benefits.  Indeed, he devotes most of his opening brief to the inconsistent decisions.  One of Dr. Weisman's primary arguments is that Guardian rejected LTD benefits, but paid STD benefits only because of the higher cost of LTD benefits, which he attributes to Guardian's conflict of interest.  He argues that this inconsistency between the award of STD benefits and the contemporaneous denial of LTD benefits is relevant to several *Booth* factors, including the fourth (whether the fiduciary's interpretation was consistent with other provisions in the plan) and the fifth (whether the decision-making process was reasoned and

principled).

Guardian asserts that it engaged in a "more thorough" investigation in considering LTD, and it notes that different people decide eligibility for STD and LTD benefits. (Def.'s Combined Mem. 25.) Guardian also relies on *Thornton v. W. & S. Fin. Grp. Beneflex Plan*, 797 F. Supp. 2d 796, 807 (W.D. Ky. 2011), in which the court rejected the plaintiff's argument that "a Plan participant who receives short-term disability will automatically qualify for long-term disability benefits," noting that he offered "no authority" for that proposition. (Def.'s Combined Mem. 24–25.)

Having reviewed the parties' arguments and authority, the court concludes that Guardian's granting STD benefits to Dr. Weisman did not automatically require granting LTD benefits. That said, this case is unlike *Thornton*, in which the difference between plaintiff's receiving STD benefits and being denied LTD benefits was that the medical records disclosed a pre-existing condition, which defendant asserted only in connection with reviewing his claim for LTD benefits. Moreover, the *Thornton* court noted that the STD and LTD plans there had "different eligibility dates" associated with pre-existing conditions. Thus, the initial grant of STD benefits "was appropriate." *Id.*

By contrast, Guardian offers no explanation based on the medical records, relevant facts, or terms of the Plan as to why it approved Dr. Weisman for STD benefits and continued paying him those benefits at the same time it was denying him LTD benefits. Indeed, Dr. Weisman is correct that the definitions of disabled in the STD and LTD policy are largely identical, a fact Guardian does not dispute. (Def.'s Combined Mem. 24–25 (noting that there are differences to the plan and describing some, but none of them are the provisions it relied upon to deny Dr. Weisman benefits)).

Dr. Weisman correctly notes that Guardian continued to pay STD benefits for months

after ruling that he was not entitled to LTD.  His LTD application initially was denied on April 28, 2022, but he was paid STD benefits throughout May and June.  These inconsistencies show a lack of "principled and reasonable" decision-making and a failure to apply the Plan consistently.  *See Mills v. Union Sec. Ins. Co.*, 832 F. Supp. 2d 587 (E.D.N.C. 2011) (where the same evidence supported applications for both STD and LTD and the administrator granted STD but denied LTD, the fourth and fifth *Booth* factors weighed against the administrator).  While Dr. Weisman offers no authority for any suggestion that Guardian is *bound* by its prior decision, *Thornton*, 797 F. Supp. 2d at 807, the court—consistent with *Mills*—agrees that these inconsistencies cause the fourth and fifth *Booth* factors to weigh in Dr. Weisman's favor.

The inconsistencies also lend support to Dr. Weisman's contention that the conflict of interest may have played some role in the denial of benefits.  (*See* Pl.'s Reply 18–19.)  As he explains, Guardian's statement that STD benefits may have been denied because they are "for a shorter period of time" suggests that the denial was based, in part, on a desire to minimize costs to the insurer.  But as plan administrator, Guardian owed Dr. Weisman a fiduciary duty and may not act contrary to that interest to benefit itself.  *See DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 417–19 (4th Cir. 2007).

* * *

For all of the foregoing reasons, *Booth* factors show that Guardian's decision denying LTD benefits to Dr. Weisman was unreasonable and thus an abuse of discretion.

## C.  Appropriate Relief

In light of its conclusions above , the court will grant Dr. Weisman's motion for summary judgment, deny Guardian's, and reverse Guardian's final decision.  It also will direct Guardian to award Dr. Weisman all benefits to which he is entitled under the Plan since January 1, 2022.

Dr. Weisman's complaint also seeks additional relief, including: (1) injunctive relief

enjoining Guardian from further violations; (2) the award of penalties and damages available under ERISA; (3) an award of prejudgment and post-judgment interest; and (4) reasonable attorney's fees and costs.  (Compl. 6–7.)  Likewise, Dr. Weisman's summary judgment motion asks for an award of prejudgment interest and reasonable attorney's fees.  (Pl's Mot. 2.)  None of these requests for relief have been briefed by the parties, however, and the court suspects that the parties may be able to reach an agreement as to some or all of them.

Accordingly, the court will direct the parties to confer over these requests for other relief. For any issues on which the parties agree, the court will require them to submit a joint proposed order to the court.  For any issues on which the parties cannot agree, Dr. Weisman shall be directed to file an appropriate motion within thirty days, and defendant will have fourteen days to respond.

### III.  CONCLUSION

For the foregoing reasons, the court will grant Dr. Weisman's motion for summary judgment, deny defendant's motion, and reverse Guardian's denial decision.  An appropriate order will be entered.

Entered: January 5, 2024.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge